**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **SHERRY LEE BURNEY,** | : |
| **Plaintiff** | : |
| v. | :  5:04-CV-437 (WDO) |
| **PATTI H. GRIMSLEY, et al.,** | : |
| **Defendants** | : |

**ORDER**

Plaintiff, a Caucasian, is a former employee of the Clerk of Court for the Twiggs County Superior Court and has sued for wrongful termination. The Defendants are the Clerk of Court, Patti Grimsley, and the County "d/b/a/" the Twiggs County Board of Commissioners. Plaintiff contends she was terminated because she was having a romantic relationship during her period of employment with a Twiggs County inmate who is African-American. Although it is not clear from the Complaint exactly what claims Plaintiff is asserting pursuant to which statutes, it appears Plaintiff is asserting a Title VII racial discrimination claim, Equal Protection claims pursuant to 42 U.S.C. §§ 1981 and 1983 and a First Amendment "freedom of association" claim pursuant to the United States Constitution. Defendants contend Plaintiff was terminated for poor work performance and after it was discovered she was involved in a relationship with the inmate, who she married after her termination.

The person with whom Plaintiff was romantically associated during her employment in the Clerk's office, Clifford Burney, was a frequent inmate at the Twiggs County jail during a substantial

1

portion of Plaintiff's last year of employment (2003). During some of the time Burney was incarcerated he was a trustee. The trustees were occasionally in the Clerk's Office emptying the trash and refilling the ice. During one of those times, Plaintiff met Burney. Plaintiff contends she had a First Amendment right to associate with him and that her discharge unlawfully infringed upon that right. Defendant Grimsley denies she discharged the Plaintiff because of her boyfriend's race or exclusively because of her association with an inmate. Defendant Grimsley contends Plaintiff's termination was based on excessive absenteeism (45 days in the last year she was employed), repeated instances of the Plaintiff failing to inform Ms. Grimsley when she would return to work, Plaintiff's mishandling of two bank deposits, Plaintiff's failure to keep court records properly indexed and up to date and her instances of insubordination. Plaintiff has filed a motion for summary judgment on the First Amendment "freedom of association" claim. Defendants did not move for summary judgment on any claim but asserted a qualified immunity defense to the First Amendment claim.

As an initial matter, any claims Plaintiff is asserting pursuant to 42 U.S.C. § 1981 are dismissed pursuant to Jett v. Dallas Independent School District, 491 U.S. 701, 731-32, 109 S. Ct. 2702, 2721 (1989) and Butts v. County of Volusia, 222 F.3d 891, 894-95 (11th Cir. 2000) which held that 42 U.S.C. § 1983 provides the sole remedy against state actors for violations of the rights contained in 42 U.S.C. § 1981. Plaintiff also asserts a 42 U.S.C. § 1983 due process violation claim because Defendant Grimsley did not give her a post-termination hearing. In a letter responding to Defendant Grimsley's inquiry as to whether Plaintiff wanted a hearing following her termination, Plaintiff instructed Defendant Grimsley that "any further correspondence should be made through my attorney, who you will be contacted by soon. Me responding to you now was only to ensure that

I met your 'seven days-in writing' deadline. I have also asked my attorney to handle my personal belongings being passed to me."[1] Following legal advice, Defendant Grimsley did not contact the Plaintiff but waited for the Plaintiff's attorney to contact her. No attorney representing the Plaintiff ever contacted Defendant Grimsley to schedule a hearing. Defendants did not "deny" the Plaintiff a hearing. Rather, Plaintiff failed to avail herself of Ms. Grimsley's offer to provide the Plaintiff a hearing. Plaintiff is therefore precluded from arguing that the Defendants denied a hearing in violation of 42 U.S.C. § 1983 due process principles, or any other constitutional provision or statute, and that claim is dismissed.

When addressing "freedom of association" claims, the courts in this circuit, and the Supreme Court, examine where and in what capacity the plaintiff worked prior to her termination, whether that employment was in the public sector and, if so, whether or how much deference should be given to the public employer's decision to terminate the plaintiff based on the specific nature and needs of the office from which a plaintiff was terminated. It is within that framework that Plaintiff Burney's First Amendment claim will be analyzed.

A leading case in this area where the Eleventh Circuit Court of Appeals went into great detail explaining First Amendment "freedom of association" rights is McCabe v. Sharrett, 12 F.3d 1558 (11th Cir. 1994). In McCabe, a police chief's former secretary sued the city and the police chief claiming they violated her constitutional right to freedom of association by transferring her to less desirable job on account of her marriage to a subordinate police officer. The court first explained, "The more a public employee's transfer or discharge is necessary to the effective functioning of the office, the more the transfer or discharge becomes justifiable, and thus the more likely it is that a

---

[1] Pl's. Trial Ex. 609.

court will find the transfer or discharge constitutionally permissible by finding the employer's interest to outweigh the employee's interest in the Pickering balance." Id. at 1570. See also Shahar v. Bowers, 114 F.3d 1097 (11th Cir. 1997) (reaffirming that Pickering, *infra*, is the appropriate balancing test for evaluating the constitutional implications of a government employer's decision based on an employee's exercise of her right to freedom of association). "In order for a public employee to establish that an employer conditioned his or her job in a way that burdened impermissibly a constitutional right, the employee must first demonstrate that the asserted right is protected by the Constitution and that he or she suffered 'adverse employment action for exercising the right. Upon making these two showings, the employee is entitled to prevail if the adverse employment action was taken in such a way as to infringe the constitutionally protected right." Id. at 1562 (citations omitted).

> According to Supreme Court precedent, the United States Constitution accords special protection to two different forms of association, "intimate association" and "expressive association." Roberts teaches that the right of intimate association - the freedom to choose to enter into and maintain certain intimate human relationships - is protected from undue governmental intrusion as a fundamental aspect of personal liberty. At a minimum, the right of intimate association encompasses the personal relationships that attend the creation and sustenance of a family-marriage, childbirth, the raising and education of children, and cohabitation with one's relatives. Whether the right extends to other relationships depends on the extent to which those attachments share the qualities distinctive to family relationships, such as "relative smallness" and "seclusion from others in critical aspects of the relationship." The right of expressive association - the freedom to associate for the purpose of engaging in activities protected by the First Amendment, such as speech, assembly, petition for the redress of grievances, and the exercise of religion - is protected by the First Amendment as a necessary corollary of the rights that the amendment protects by its terms. Both the intimate and the expressive association rights are considered fundamental. Therefore, a plaintiff like McCabe can obtain special protection for an asserted associational right if she can demonstrate either that the asserted association closely enough resembles a family relationship to be protected by the right to intimate association, or that the purpose of the association is to engage in activities independently protected by the First Amendment.

Id. at 1562-63 (citing Roberts v. United States Jaycees, 468 U.S. 609, 617-20, 104 S. Ct. 3244, 3249-51 (1984)) (other citations omitted).

> The Pickering test requires balancing "the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." The Supreme Court has described such balancing as necessary "to accommodate the dual role of the public employer as a provider of public services and as a government entity operating under the constraints of the First Amendment." According to this theory, allowing unchecked public employee expression would be inappropriate because some expression might hinder the performance of public functions, but giving public employers free rein to silence discourse would also be unacceptable for it would allow employers to censor employee speech because they disagree with its content rather than because it disrupts workplace functioning.

Id. at 1564-65 (citing Pickering v. Board of Education, 391 U.S. 563, 568, 88 S. Ct. 1731, 1734-35 (1968)) (other citations omitted).

> In cases where the employer denies taking the adverse employment action solely because of the public employee's exercise of speech rights, courts perform the causation analysis first articulated in Mt. Healthy City School District Board of Education v. Doyle. First, courts require that the employee, in order to prevail, prove that the speech at issue was a "substantial factor" in the government's decision to demote or discharge the employee. Even if the employee meets the "substantial factor" burden, and even if the challenged action would be otherwise impermissible, the government will nonetheless prevail if it can show that "it would have reached the same decision even in the absence of the protected conduct."

Id. at n.5 (citing Mt. Healthy, 429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977)).

"The Supreme Court has identified a number of factors for courts to consider when performing the balance: (1) whether the employee's exercising rights 'impairs discipline by superiors or harmony among co-workers'; (2) whether the employee's exercising rights 'has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary'; and (3) whether the employee's exercising rights 'impedes the performance of the employee's duties or interferes with the regular operation of the enterprise.'" Id. at 1570 (citing Rankin v. McPherson,

5

483 U.S. 378, 388, 107 S. Ct. 2891, 2899 (1987)). "Where loyalty to an employer and the ability to keep confidences are essential to the proper performance of public functions, the public employer's interest will weigh heavily if the employee's exercise of the right would compromise loyalty and confidentiality, because restricting those rights may be necessary to preserve the employer's interest in effective office functioning." Id. at 1570-71. "For this reason, 'when close working relationships are essential to fulfilling public responsibilities,' the Court has accorded 'a wide degree of deference to the employer's judgment.'" Id. "Under Pickering, the permissibility of adverse employment action taken against a public employee because of the employee's exercise of a constitutional right is determined by weighing the employee's interest in exercising the right against the government's interest in 'promoting the efficiency of the public services it performs through its employees.'" Id. at 1561 (citing Pickering, 391 U.S. at 568, 88 S. Ct. at 1734-35). The Pickering balance is a question of law and the district court may grant summary judgment based on the outcome of the balance. Id. at n.15.

> Because McCabe was married to one of Chief Sharrett's subordinates, Joel McCabe, Chief Sharrett had no alternative for ensuring the confidentiality of his office besides transferring McCabe. Because Chief Sharrett's transferring McCabe was necessary to serve his interest in maintaining the effective functioning of his office, we readily conclude that appellees' interests are heavy enough in this situation to outweigh McCabe's interest in her marital association even without any evidence of actual disruption. McCabe's exercising her intimate association right to be married to Joel McCabe would compromise two qualities necessary to the effective performance of her job-her loyalty to Chief Sharrett and her ability to keep confidences, and that appropriate regard for the police department's legitimate interests thus required McCabe's transfer.

Id. at 1574. "It is a matter of common experience that spouses tend to possess a higher degree of loyalty to their marital partners than to their superiors, and often discuss workplace matters with one another, even matters that a superior has designated as confidential. Thus, as a matter of common

experience it is objectively reasonable for a police chief to be concerned about confidentiality when his confidential secretary is married to a subordinate." Id. at 1572. Based on the foregoing analysis, the court of appeals found it was not only reasonable but necessary for the Chief to transfer the plaintiff in order to preserve the confidentiality of his office. Id. Because the plaintiff's transfer did not infringe her intimate association right to be married, the court of appeals held that the district court properly granted summary judgment to the defendants.

In Chesser v. Sparks, an employee was terminated from her position as a county clerk and brought a § 1983 action against the County Commissioner alleging, *inter alia*, First Amendment "freedom of association" claims. Chesser v. Sparks, 248 F.3d 1117 (11th Cir. 2001).

> Chesser began working in the clerk's office in Haralson County, Georgia, in 1985. At the time of her discharge in February 1997, she held the position of Assistant County Clerk. Her responsibilities included the preparation of the payroll for the Count's several departments, including the sheriff's office. . . .
>
> In the November 1996 general election, defendant Amos Sparks was elected Commissioner and Chesser's then-husband, Ronnie Kimball, was elected Sheriff; both took office on January 1, 1997. Sparks and Kimball were political enemies. So, in an effort to avoid what might appear to be a conflict of interest, Chesser arranged for a co-worker to prepare the payroll for the sheriff's department.
>
> On February 6, 1997, Sparks issued a memorandum to all county deparments which stated that, due to budget concerns, overtime would not be reimbursed in the form of wages. Notwithstanding this instruction, overtime wages were paid to sheriff's department employees. Calling her attention to his memorandum, Sparks asked Chesser why overtime had been paid. After disclaiming knowledge of the memorandum, Chesser said that the County's failure to compensate overtime in the form of wages would violate the Fair Labor Standards Act. Sparks terminated Chesser's employment on February 20, 1997; his stated reason for the termination was that she was insubordinate and demonstrated a "lack of cooperation."

Id. at 1120.

Addressing the defendants' assertion of qualified immunity the court explained, "While

qualified immunity is typically addressed at the summary judgment stage of the case, the defense may be raised and considered on a motion to dismiss; the motion will be granted if the 'complaint fails to allege the violation of a clearly established constitutional right.'" Id. at 1121 (citation omitted). "Qualified immunity protects government actors performing discretionary functions from being sued in their individual capacities. The doctrine shields government officials from liability to the extent that 'their conduct does not violate clearly established constitutional rights of which a reasonable person would have known.'" Id. at 1121-22 (citing Harlow v. Fitzgerald, 457 U.S. 800, 817-18, 102 S. Ct. 2727, 2738 (1982)). "The doctrine protects government officials from always 'erring on the side of caution' by shielding them both from liability and the other burdens of litigation, including discovery." Id. "Evaluating the defense of qualified immunity involves a two step inquiry: first, whether the defendant's conduct violated a clearly established constitutional right; and, second, whether a reasonable government official would have been aware of that fact. This two-step inquiry is designed to 'provide ample protection to all but the plainly incompetent or those who knowingly violate the law.'" Id. at 1122 (citations omitted). "A plaintiff cannot avoid the qualified immunity defense by referring to general rules and to the violation of abstract 'rights.'" Id. "If the constitutional right has been clearly established, the plaintiff must demonstrate that a reasonable government actor would have known that what he was doing infringed that right." Id.

Because the plaintiff in Chesser was speaking as an employee about whether the county should pay overtime wages, rather than speaking as a citizen on behalf of the public, her speech was not a matter of public concern and thus was not constitutionally protected. Further, because Sparks reasonably believed that Chesser was being insubordinate and disruptive, he was justified in discharging her. Id. at 1124.

To prevail on her theory that she was terminated because of her association with her husband, the plaintiff had to demonstrate that she had a constitutional right to that association and that she suffered an adverse employment action for exercising the right. Id. When the plaintiff establishes both elements, courts use the Pickering balancing test to determine whether the adverse employment action was permissible. Id. "At a minimum, the right of intimate association encompasses the personal relationships that attend the creation and sustenance of a family - specifically marriage." Id. The court stated that the county certainly had an interest in having employees who are not insubordinate. Id. at 1125.

Because the court found no "concrete and factually defined case that has held unconstitutional an employer's decision to discharge an employee due in part to insubordination," it found that a reasonable government actor in Sparks' position would have no reason to believe that such a decision would violate the law. Id. Based on the foregoing, Defendant Grimsley would be entitled to qualified immunity on the First Amendment claims against her in her individual capacity only if Plaintiff Burney failed to show the violation of a clearly established law of which Grimsley should have been aware. To make that determination, Plaintiff's claims must be analyzed in light of the examples given thus far and below regarding "freedom of association" claims.

In Caraballo-Sandoval, a prisoner and his wife sued prison officials who frustrated the wife's attempts to visit her husband in prison. Caraballo-Sandoval v. Honsted, 35 F.3d 521 (11th Cir. 1994). The district court dismissed the case and the court of appeals held that inmates "do not have an absolute right to visitation, such privileges being subject to the prison authorities' discretion provided that the visitation policies meet legitimate penological objectives." Id. at 525. The court noted that former prison employees, like the wife in that case, visiting inmates "may pose a threat

to security because of their knowledge of security procedures constitute a legitimate penological objective." Id. See also Ross v. Clayton County, 173 F.3d 1305 (11th Cir. 1999) (a correctional officer's demotion for living with his brother, an active probationer, did not violate the officer's First Amendment freedom of association rights, inasmuch as the county's interests in enforcing the rule prohibiting employees from associating without permission with known inmates, active probationers, or parolees were well-founded, given the county's special need in the law enforcement context to employ persons who acted with good judgment and to avoid potential conflicts of interest); Parks v. City of Warner Robins, 43 F.3d 609, 614 (11th Cir. 1995) (Warner Robins' anti-nepotism policy did not directly and substantially interfere with the right to marry because it did not create a direct legal obstacle that would prevent absolutely a class of people from marrying.); Fagan v. City of Marco Island, 2005 WL 1667662 (M.D. Fla. July 15, 2005) (When a former police officer was fired for "associating" with a former employer who was also a convicted felon, not responding truthfully when questioned about an incident and revealing facts of a police investigation to the felon, the court found the relationship between the plaintiff and the convicted felon-former employer was not a relationship protected by the right of intimate association.).[2]

Although Plaintiff Burney did not have an absolute right to associate with an inmate while she was employed at the Clerk's office, her relationship with the inmate was (and still is) a relationship that falls within the Supreme Court's definition of those relationships entitled to First Amendment protections under certain circumstances. However, in order to prevail, Plaintiff must

---

[2]Plaintiff also relied on Wilson v. Taylor where a police officer was fired because of his association with the woman he was dating and the court found that infringed his constitutionally protected freedom of association. Wilson v. Taylor, 733 F.2d 1539 (11th Cir. 1984). However, Wilson has been widely criticized for, *inter alia*, the panel's failure to utilize the Supreme Court's Pickering test and is therefore not good precedent, or at least not precedent that is helpful to this case.

prove that her association with an inmate was a "substantial factor" in Grimsley's decision to discharge her. Even if she meets this "substantial factor" burden, and even if the challenged action would be otherwise impermissible, the Defendants will nonetheless prevail if they can show that Grimsley would have reached the same decision even in the absence of Plaintiff's association with an inmate.

Plaintiff acknowledged that Grimsley was very upset about the relationship with the inmate and had never "run across a situation where she had to deal with an employee being involved with an inmate."[3] However, there is no evidence that Plaintiff's relationship with the inmate in question was a "substantial factor" or the most important factor in her discharge. For one thing, it was more than six months after Grimsley found out about the relationship that Plaintiff was terminated. Second, Grimsley testified that Plaintiff was terminated because of numerous problems with her work performance such as the manner in which she performed her tasks, her tardiness, her absenteeism and her insubordination. Even if Plaintiff had satisfied these factors, Grimsley's testimony reveals that she would have terminated Plaintiff regardless of her relationship with the inmate based on Plaintiff's performance issues.

Public employees have more limited rights regarding the individuals with whom they associate, even those protected "intimate" relationships, based on the function of their jobs in the public sector. Plaintiff's loyalty to her former employer and the ability to keep confidences were essential to the proper performance of the functions of the Clerk's office. Plaintiff very likely had access to and at least knowledge of the jail's security procedures. Plaintiff mostly handled the criminal filings, including taking and recording fines. The likelihood that someone in the Clerk's

---

[3] Pl's. Dep. at 98.

11

office would have more intelligence on what was going on in the jail as far as procedures and security measures weighs very heavily in the Defendants' favor. The deposition testimony revealed that the County employees were in frequent contact with each other, particularly law enforcement officials and employees in the Clerk's office. More important, the county in question involves a very small town, or small towns, and the government offices are in much closer proximity than larger towns. The fact that Plaintiff allowed the inmate in question to use her cellular phone shows she was in fact helping the inmate violate the jail's policy of not allowing cellular phones in the cells. At one point the inmate was stopped driving Plaintiff's car during which a crack pipe was found in the car. The evidence clearly shows that Plaintiff's relationship could and did interfere with the business of the Clerk's office.

Defendants reasonably believed that Plaintiff's relationship with the inmate posed a threat to the information kept in and procedures of the Clerk's office and the security of the jail, and thus the security of the public in general. The county has a valid interest in prohibiting its employees who work for the court from associating with inmates based on the county's need, in the law enforcement context, to employ persons who act with good judgment and to avoid potential conflicts of interest. There was an extraordinary need to ensure no confidential information was leaked by the Plaintiff to her boyfriend the inmate and to ensure that he received no special information or treatment because of Plaintiff's position, which would have induced extreme unrest among other inmates. As in McCabe, Plaintiff and her boyfriend, and now spouse, would tend to possess a higher degree of loyalty to each other than to their superiors and would very likely discuss workplace matters with one another, even matters that Plaintiff's superior had designated confidential. Thus, as a matter of common experience it was objectively reasonable for Grimsley, on behalf of the county and its

citizens, to be concerned about confidentiality and security in the Clerk's office when Plaintiff was having an intimate relationship with a frequent Twiggs County inmate.  In this case, the public employer's interest weighs heavily on the Pickering scale because Plaintiff's exercise of her right of "freedom of association" compromised her loyalty and confidentiality to Grimsley and the court as a whole.  Accordingly, Plaintiff failed to establish that her termination infringed her First Amendment right to freedom of association with an individual who was an inmate during the period of her employment.

Because Plaintiff Burney failed to state a 42 U.S.C. § 1983 First Amendment claim for violation of her right of "freedom of association," that claim is dismissed against all Defendants. Further, because Plaintiff failed to allege a violation of a constitutional right of which Defendant Grimsley should have been aware, Grimsley is entitled to qualified immunity on that claim.  Because no qualified immunity exists for individuals sued under Title VII, that analysis does not apply to Plaintiff's Title VII claim.  Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991).  The First Amendment "freedom to associate with an individual who is an inmate" claim against the County "d/b/a/" the Twiggs County Board of Commissioners is also dismissed because, although the parties concede Defendant Grimsley was a "final policymaker" for the County, Plaintiff failed to show that this alleged discrimination occurred pursuant to a custom or policy of the County.  Id. at 776.[4]

---

[4] It is not clear from the Complaint and Plaintiff's subsequent pleadings whether she intended to file two separate First Amendment claims - one dealing with her right to associate with an inmate and one dealing with her right to associate with an individual of another race - or whether the First Amendment claim encompasses a general "freedom to associate with whomever she pleased" allegation with the racial discrimination being addressed in the Title VII and Equal Protection claims.  The claims addressed herein are done so based on the assumption that the Plaintiff intended the First Amendment claim to be a claim that she had the freedom to associate with an inmate while she was employed at the Clerk's office because her arguments in her brief lean more toward that type of claim.  Such as, Plaintiff made several arguments about how her relationship with an inmate did not disrupt the Clerk's office, how the inmate was not a danger because he was a trustee on some of the occasions when was incarcerated, etc.

Grimsley is a county official serving in a supervisory capacity. By suing Grimsley in her official capacity, Plaintiff is effectively suing the county. Therefore, it is redundant and unnecessary to keep the county Defendants as Defendants on Plaintiff's Title VII claim. Johnson v. Waters, 970 F. Supp. 991, 1005 (M.D. Ala. 1997) (citing Cross, 49 F.3d 1490, 1504 (11th Cir. 1995)). Plaintiff's Title VII claim against the County and/or the County "d/b/a/" the Twiggs County Board of Commissioners, and to the extent that Plaintiff intended to assert claims against the individual commissioners, are DISMISSED. Because there is also no individual liability under Title VII, only liability against "employers," the Title VII claim against Grimsley in her individual capacity is DISMISSED. The Title VII claim(s) and the Equal Protection claim(s) to the extent Plaintiff intended to assert an Equal Protection claim separate from or in addition to a Title VII claim shall proceed only against Defendant Grimsley in her official capacity as the Clerk of Court for the Twiggs County Superior Court. Because Plaintiff failed to allege any claims against the "John Doe" Defendant, that entity/individual is DISMISSED from the case. Plaintiff's latest motion in limine will be addressed in the pretrial conference.

       **SO ORDERED this 28th day of June, 2006.**

       **S/**
**WILBUR D. OWENS, JR.**
**UNITED STATES DISTRICT JUDGE**